1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PABLO ANDRES COBB,

11              Petitioner,              No. CIV S-04-1299 RRB EFB

12      vs.

13   SCOTT KERNAN, Warden, et al.,

14              Respondents.            FINDINGS & RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 1998 judgment of

18   conviction entered against him in the Sacramento County Superior Court on charges of first

19   degree murder, burglary and attempted robbery.  Petitioner seeks relief on the grounds that: (1)

20   his constitutional rights pursuant to the Fifth, Sixth and Fourteenth Amendments were violated

21   when the trial court admitted into evidence his statements to police; and (2) his trial counsel

22   rendered ineffective assistance when he failed to make additional arguments in support of his

23   motion to suppress petitioner's confession.  Upon careful consideration of the record and the

24   applicable law, the undersigned recommends that petitioner's application for habeas corpus relief

25   be denied.

26   /////

1

**I.      Procedural Background**

After a jury trial, petitioner was convicted of first degree murder, burglary and attempted robbery.[1]  Clerk's Transcript on Appeal (CT) at 653-55.  The jury found true special circumstances that the murder was committed during the commission or attempted commission of a burglary and a robbery.  *Id.*  The jury also found true allegations that petitioner personally used a gun during each of the crimes.  *Id.*  Petitioner was sentenced to life without the possibility of parole plus a three-year determinate prison term.  *Id.* at 758.

Petitioner and co-defendants Avila and Reynoso filed timely appeals in which they each joined in all applicable arguments made by the others.  Answer, Exs. A, B, C.  The California Court of Appeals for the Third Appellate District affirmed all of the judgments of conviction. Answer, Ex. H.  On May 29, 2002, petitioner filed a petition for review in the California Supreme Court.  Answer, Ex. I.  That petition was summarily denied by order dated July 17, 2002.  Answer, Ex. J.  On July 7, 2003, petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  Answer, Ex. K.  That petition was summarily denied by order dated April 28, 2004.  Answer, Ex. L.  Petitioner filed the instant petition for a writ of habeas corpus on July 8, 2004.

**II.     Factual Background[2]**

**A.  The Prosecution Case**

> The victim of the crimes was 22-year-old Nick Godinez (Godinez).
> Godinez, his girlfriend Kristina Ramirez (Kristina), and their baby
> girl lived in a house on 25th Street in the south area of Sacramento.

_____

[1]  Petitioner was tried jointly with co-defendants David Reynoso and Cruz Avila.  Mr. Reynoso filed a petition for writ of habeas corpus with this court on February 12, 2003, in case No. S-03-0272 RRB EFB P.  Mr. Avila filed a petition for a writ of habeas corpus with this court on June 2, 2003, in case No. S-03-1173 RRB EFB P.  All three cases have been related in this court.  The state court records were lodged by respondent in the habeas petition filed by Mr. Avila.

[2]  This statement of facts is taken from the May 2, 2002 opinion by the California Court of Appeal for the Third Appellate District ("Opinion"), at 3-11, appended as Exhibit H to Respondent's Answer, filed on October 5, 2004.

Kristina had known the defendants – Avila, Cobb, and Reynoso – for years.  Godinez had been introduced to Avila, but not to the other defendants.  Indeed, in the first week of March 1996, Kristina and the defendants were together at a birthday party for her best friend, Gumecinda Guillen.

After 2:00 in the morning of March 6, 1996, Godinez was at home, drinking and playing a video football game in his living room with his cousin, Guillermo Mayorga (whose nickname is "Gigi").  Kristina and the baby were asleep in the master bedroom.

According to Mayorga, he and Godinez were interrupted by a loud crashing noise at the front door.  Godinez ran toward the hallway.  As Mayorga got up to follow, he heard what he believed was the loud sound of a gun cocking or "racking," and a man saying, "Get the fuck on the ground.  Spread your legs. Spread your hands.  Don't fucken move.  Don't turn.  Don't look.  Fucken lay down, or I'm going to fucken spray your ass."  Although Mayorga did not see who spoke, he believed there were at least two intruders.  When Mayorga heard shots coming from a back room, he looked up, and seeing no one, escaped through a back door.

Kristina awoke to Godinez's shouts for her to "get down."  While Kristina shielded the baby with her body on the floor, the bedroom door was thrown open.  Kristina heard a struggle and shots on the other side of the bed, and then heard more struggling and shots in the hallway, but she could not see well enough to identify anyone.  After the intruders fled, Godinez called Kristina from the entry of the house, told her that he had been shot, and asked her to call for help.  Finding her own phone dead, Kristina ran to a neighbor's house.[3]  When she returned, Godinez was lying on the entry floor and they talked for a while.  Godinez told Kristina that he did not know who had shot him.  Godinez died on the floor.

The autopsy revealed that Godinez had sustained three bullet wounds in his left upper back, which were angled sharply downward, as though Godinez was shot by someone standing above him.

A .45 caliber Randall pistol that Godinez usually kept in the master bedroom was next to him in the entry; it was jammed and inoperable.

The interior wooden casing for the front door, to which deadbolt casing and another latch had been attached, was shattered, showing the door had been broken in.

---

[3]  Police records indicate a 911 call was placed by the neighbor at 2:27 a.m.

3

Three guns were recovered at or near the 25th Street house: a loaded nine-millimeter Taurus handgun found under the bed in the master bedroom; a loaded .25 caliber semiautomatic handgun recovered from nearby bushes; and a loaded nine-millimeter Mac 10 semiautomatic gun also recovered from a neighbor's yard.[4]

Forensic evidence established that Godinez was killed by shots fired from the Mac 10. Expended shell casings found both inside and outside the front door were also determined to have been fired by the Mac 10. No evidence was found that either the nine-millimeter Taurus or the .25 caliber pistol had been fired at the house.

Expended bullets and shell casings were found in the master bedroom and were determined to have been fired from Godinez's gun.

Within minutes of the arrival of emergency personnel to the 25th Street house, a nearby hospital called police to report two gunshot victims – defendants Avila and Reynoso. Reynoso had suffered gunshot wounds to his right knee and left shoulder. Significantly, the bullet recovered from Reynoso's knee was determined to have been shot from the Mac 10 found in Godinez's neighbor's yard. Avila had a gunshot wound in his side.

A nurse in the emergency room, who was attending to Reynoso, reported to police that she overheard him telling Avila in a hushed, urgent voice what Avila should say to police.

Interviewed by police at the hospital, Reynoso was uncooperative and belligerent, refusing initially to give his name or any details of the shooting. Police heard Reynoso tell Avila not to speak to the police because "the police cannot help us." Reynoso later denied any involvement in the shooting near 25th Street. He instead told police that he had been shot while trying to buy drugs at a park, when "three black guys tr[ied] to rob us."

The police's initial attempts to interview Avila at the hospital were repeatedly interrupted by Reynoso. Although initially uncooperative and reporting he had been shot while with Reynoso at a park, Avila later agreed to answer questions about the shooting on 25th Street and conceded his involvement. He admitted kicking the front door, being armed with a .25 caliber gun, and throwing the gun into some bushes as he left the house.

---

[4]  The police officer who recovered the Mac 10 testified that chambering the initial round in that gun would create a "very loud, very distinctive" sound that "most people" with experience would recognize as the loading of a firearm.

Police also found Avila's driver's license in a car owned by Reynoso's girlfriend.  Blood was on both passenger seats.

The prosecution's theory of the case was that Godinez was a drug dealer from whom defendants had intended to steal drugs or cash.

Two slips of paper discovered by police in Godinez's kitchen were introduced into evidence.  The first, People's Exhibit 128, was a Tower Records receipt dated March 3, 1996, bearing a list of handwritten entries on the reverse side:  "Dru 5,850; Dre 1,300; Rovt 7,000; Gigi 3,500; T 600."  The second, People's Exhibit 127, contained a similar series of handwritten entries:  "Dru 2,300; Dre 1,400; Tre 1,400; B.B. 2,000; J 7,100; R 500; Gi 800." Kristina identified the signature and handwriting on Exhibit 128 as Godinez's.  But she was not asked to identify the handwriting on Exhibit 127.  Moreover, Kristina testified that she did not know the meaning of the entries on Exhibits 127 or 128, except to say that she recognized the entry "Gigi" on exhibit 128 as a reference to Godinez's cousin Mayorga.

A police expert in methamphetamine trafficking testified that he "instantly" believed that People's Exhibits 127 and 128 were examples of the "very common pay/owe sheet[s]" used by drug dealers to record their transactions, and that the entries on those sheets suggested transactions of an "upper level" dealer, who dealt in pounds (not ounces) of methamphetamine.  He testified that it is common not to find any narcotics at the drug dealer's residence because the dealers prefer to store them at a safe house.  Indeed, a drug-sniffing dog detected no methamphetamine or cocaine at the Godinez residence, only some marijuana.

Defendant Cobb's older brother, Joseph Cobb (Joseph or Joseph Cobb), testified at trial.  He denied that he had ever heard defendants discussing Godinez.  Although Joseph admitted that he might have heard from someone that Godinez "might had been balling," he denied discussing that fact with defendants.[5] However, in a recorded interview with police played for the jury, Joseph had reported that Reynoso and Avila had told him that Godinez was "balling" and selling drugs.  Joseph had also reported that Kristina had told her friend, Gumecinda Guillen, while they were all together at Guillen's home, that Godinez was dealing in drugs.

/////

/////

_____

[5] "Balling" is slang for having a lot of money or succeeding financially.  It can also refer to narcotics dealing.

A separate jury, which was empaneled to determine the allegations against defendant Cobb alone,[6] also heard Cobb's videotaped confession to police.  Cobb admitted learning from Reynoso that Godinez "was a big time drug dealer.  He sold, you know, pounds and all kinds of stuff and had all kind of money and stuff."  According to Cobb, all three defendants went to Godinez's house intending to "lick[7] this baller," so that they could "get the dope and the money."  Cobb admitted that he shot Godinez and wounded Reynoso accidentally, while Godinez and Reynoso were scuffling on the floor in the entry of Godinez's house.  Cobb explained, however, that he shot Godinez only after Godinez first shot at him.

Cobb's jury also heard evidence that after Avila and Reynoso went to the hospital, Cobb had called his friend Oscar Norton to pick him up from a nearby market.  Norton testified that Cobb had told him that Avila and Reynoso had been shot when they had gone "to go lick some dude."

## B.  The Defense Case

Reynoso testified at trial to a different scenario than that outlined by the prosecution.  He said that he knew Godinez well because in the past years, Godinez had "fronted" him methamphetamine to sell.  Reynoso stated that two years prior to the shooting, he had received drugs to sell from Godinez – five pounds of methamphetamine worth $20,000.  However, Reynoso never paid Godinez because the drugs had disappeared from Reynoso's apartment while he was in jail on an unrelated charge.

Reynoso testified that Godinez contacted him on the night of the murder and asked him to come over "to discuss the problem we had with the money" that Reynoso still owed him from the drugs.  Reynoso explained these circumstances to Cobb and Avila.  Because "there might be a problem," Reynoso asked them to accompany him to Godinez's house and to bring their guns "just in

case."  Avila drove the car to Godinez's house.  Reynoso testified that he carried the nine-millimeter Taurus.

According to Reynoso, he went alone to Godinez's front door, knocked, and was admitted by Godinez.  (But Mayorga and Kristina testified that Godinez never indicated that he was expecting Reynoso, and Mayorga testified that no one ever

---

[6]  All three defendants were tried in the same proceeding, but the action against Cobb was tried to a separate jury in light of his pretrial confession.

[7]  To "lick" someone means to rob the person.

6

1    knocked on the door or asked to be admitted.)  According to
     Reynoso, after Godinez closed and locked the door behind him,
2    Godinez drew a gun and demanded:  "Yeah, where's my shit now?
     I'm either going to get paid, or you're going to get smoked."
3    Reynoso testified that he ran down the hallway into the master
     bedroom, yelling for Kristina.  Reynoso and Godinez fell over
4    each other and began wrestling for Godinez's gun when it went
     off.  Reynoso felt himself shot in the shoulder, and his gun
5    dropped to the floor.  Reynoso saw that Godinez's gun had
     jammed, tried to escape, and yelled for help.  Then he noticed the
6    front door, which was open.  As Reynoso neared the front door,
     Godinez grabbed him from behind.  As the two were wrestling
7    again on the floor, Reynoso heard some shots and felt something
     like a hammer hit his knee.  Godinez stopped struggling, and
8    Reynoso saw Cobb for the first time.  Cobb helped him up and out
     of the house.
9
     Reynoso and Cobb ran to the car.  Avila was already driving.
10   Cobb told the others that he had shot Godinez, saying, "Man, I had
     to do it.  I had to do it."
11
     Reynoso also admitted that he and the others had fashioned a lie to
12   tell the police about how he and Avila had been shot because Cobb
     wanted them to conceal his involvement.
13
     Cobb's mother testified on her son's behalf that Cobb was living
14   with her in March of 1996, and that she had never before seen the
     Mac 10 used to shoot Godinez.
15

16   **III.    Analysis**

17        **A. Standards for a Writ of Habeas Corpus**

18        Federal habeas corpus relief is not available for any claim decided on the merits in state

19   court proceedings unless the state court's adjudication of the claim:

20        (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
21        determined by the Supreme Court of the United States; or

22        (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
23        State court proceeding.

24   28 U.S.C. § 2254(d).

25        Under section 2254(d)(1), a state court decision is "contrary to" clearly established

26   United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

                                           7

set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

### B. Petitioner's Claims

#### 1. Petitioner's Statements to Police

Petitioner claims that his statements to police should not have been admitted at his trial because they were involuntary and coerced and were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). After setting forth the factual background, the court will evaluate these claims in turn below.

////

////

8

1                        **a. Factual Background**

2          The California Court of Appeal fairly described the background to petitioner's claims

3   regarding the admission into evidence of his statements to police as follows:

4                  Cobb challenges the admission of his confession to police, which
                   he had moved to suppress.  He claimed the statement was (1)
5                  obtained in violation of *Miranda, supra,* 384 U.S. 436 [16 L.Ed.2d
                   694], because it was elicited after Cobb had invoked his right to
6                  remain silent and had asked to speak to an attorney, and (2)
                   procured by coercion by reason of threats to, or manipulation of,
7                  Cobb's girlfriend, Travece LeTourneau.  The trial court denied
                   Cobb's motion to suppress, and the Cobb jury viewed a portion of
8                  the interview on videotape and was provided a written transcript.

9                                          * * *

10                 We provide verbatim the relevant part of the interrogation, and for
                   ease of review, we have italicized Cobb's purported requests to
11                 halt the interrogation:

12                 "COBB:  . . . I wasn't with David and Cru[z].  I was at home.

13                 "WINTON:  Okay.

14                 "COBB:  That, you know?  *I don't even want to talk about it.  I
                   told you what I had to say.  You got my statement.  I just want to go*
15                 *home.*

16                 "WINTON:  Okay.  Well, you're not going home.  You are not
                   going home.

17
                   "COBB:  Why not?
18
                   "WINTON:  Okay.  Because I just got done talking to Tra –
19                 Travece[8].

20                 "COBB:  Yeah.

21                 "WINTON:  Okay?  And she told me everything that you told her,
                   okay?  She told me what happened, why it happened, and how it
22                 happened and your involvement, okay?  There's other people that I

23   ───────────────────────

     [8]  Cobb was accompanied to the police station by his then-girlfriend Travece
24   LeTourneau; the two were joined later by LeTourneau's grandmother.  Detective Winton
     interviewed LeTourneau first.  He told her Avila and Reynoso had "roll[ed] over on" Cobb, i.e.,
25   had told police of Cobb's involvement in the murder.  LeTourneau became convinced during her
     conversation with Winton that Cobb should talk to Winton.  She eventually told Winton that
26   Cobb had admitted to her that he shot Godinez to protect Reynoso.

have talked to about your involvement in this thing too.  They can't sit across there anymore, Pablo, and deny that this thing [unintelligible] happened.

"COBB:  *Man, I wasn't there.  I don't want to talk.  I wasn't there and that's it.*

"WINTON:  Okay.

"COBB:  I was at home.  I – you know what –

"WINTON:  You know, a lot of times we try to – we try – when we talk to people we try to get them to help – to help themselves, okay?  And a lot of times, uh, like I spoke with your mom the other day, we don't want people to throw this whole thing on Pablo Cobb and make him the bad guy in this whole thing.

"COBB:  I – Pablo Cobb wasn't there, so Pablo Cobb ain't worrying about nothing.

"WINTON:  Okay.  So from what you're telling me here, that you weren't there, we talked to Shem.  You initially said you were with Shem.

"COBB:  I said I was at home, and Shem was at my house.

"WINTON:  Okay.  Um, you know, Pablo, I'm – I'm really kind of surprised.  I thought for sure that you would come in here and rise above what happened here, and be a man and stand up here and say what happened and your involvement in this thing.  I'm really kind of surprised about this.  You know, the whole time that this investigation has been going on, my friend, I've listened to people who tell me that you're – you're – you're guilty – you're [sic] guilt in this thing is real bad.  You're having a hard time dealing with it.  You know it was wrong.  You – you got somebody involved into something where you – now the person had a little baby, and that one doesn't have a father anymore.  I know all this stuff, okay?  And you can't come in here with – with all that weight on your shoulders and stuff and deny anything ever happened.

"COBB:  I wasn't – I wasn't with them.  I – I wasn't with them.

"WINTON:  They say you were.  Why would they say that?

"COBB:  Who said they – I was?

"WINTON:  David and Cr[uz].

"COBB:  Shh – why?  Shoot.  You ask them why they say that.

"WINTON:  Well, because they haven't got anything to hide.

10

1     "COBB:  Man, I wasn't with them.

2     "WINTON:  Huh.  Okay so, uh –

3     "COBB:  *I don't want to talk about this.  I don't have nothing to*
      *do what that.*

4

5     "WINTON:  Okay.  You don't want to talk about it anymore?

     "COBB:  No.  I had nothing to do with that.

6

7     "WINTON:  Okay.  Okay.  Well, right now then you're under
      arrest for a murder, okay?  For the murder of Nicholas Godinez.

8     "COBB:  Man, for what?

9     "WINTON:  Okay?  I just told you.  I told you.  I know – I know
      now.

10

11     "COBB:  No, I wasn't – man I wasn't with him.  That's bullshit,
      man.

12     "WINTON:  Pablo – Pablo – Pablo, hold it, man.

13     "COBB:  No.  Pablo nothing, man.

14     "WINTON:  When – if – if you're going to sit there –

15     "COBB:  You ain't –

16     "WINTON:  I – I – you know what?  Like you said, you think I'm
      wasting your time, okay?  Well, at a point – when you – you're

17      telling me – your denials and stuff like that are – are – I mean, you
      can't deny it.  One person cannot deny all the stuff we have on

18      you, all right?

19     "COBB:  I wasn't – I – well, I wasn't there, so –

20     "WINTON:  Okay.  Hey, you can live with yourself thinking that.
      That's fine.

21

22     "COBB:  You can live with yourself trying to accuse someone of
      doing something they didn't have nothing to do with then that's

23      fine, too, then.

24     "WINTON:  Okay.  But I – you know, I have the truth on my side,
      though.

25     "COBB:  Man, you – whew.  I wasn't there, man.  I wasn't there.

26     "WINTON:  First day of the rest of your life Pablo, okay?  You

can – if you can live in your heart about what happened and your involvement in this thing, and you're willing to sit there quietly and let somebody else accuse you of being a big head – head to head part of this whole thing, that's fine.  It's different when you're there.  You get pulled into something that you didn't mean to get pulled into.  It's different when you're there, and you think you guys are going to do one thing and something else happens, okay?

"COBB:  I wasn't there.

"WINTON:  It's different when you go in there seeing that a friend of yours is getting hurt and stuff, and you're doing what all you can to keep that guy from being killed.  I understand that.

"COBB:  I wouldn't know, 'cause I wasn't even there.

"WINTON:  Okay, I'll tell you what.  I'm going to go get some paperwork and stuff like that, and I'll come back, okay?  Think hard about what you're doing here, okay?  Just think about it."

Cobb then spoke with his girlfriend, LeTourneau, alone in the interview room.  She repeatedly urged Cobb to talk to Winton, as shown in the following footnote.[9]  It is evident from the videotape

---

[9]   Alone with Cobb in his interview room, LeTourneau repeatedly urged Cobb to talk to Winton, and he finally agreed to do so:

> [LeTourneau]:  "They're trying to point the finger at you, but [David] planned it out.  Now, they have attorneys and now the attorneys are helping them, but they've already gave their statements before they even had attorneys.
>
> Cobb:  Okay.
>
> [LeTourneau]:  So you need to talk to them right now, and tell him.  You need to tell him that you did not plan this.
>
> Cobb:  No, No, I can't.  I've got to see paperwork.  I need a lawyer.  I want a lawyer.
>
> [LeTourneau]:  Oh, Pablo, if you want to – if you want a lawyer that's fine.  You're going to get washed.  I'll get you the lawyer, but you're going to get washed.  I'm not lying.  I'm serious.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> [LeTourneau]:  . . .  Now, listen, You stick to the story.  You can tell them that now.  David and Cr[uz] have already told their story,

12

1

_____

2    so that – they've already got everything out, you know?  David
     does – he has an attorney, but the attorney is not good.  He lets him
3    talk, okay?  Cr[uz] probably ran his mouth.  He already told before
     he had his attorney.  Now he has an attorney to fight for the
4    manslaughter this and that.  He's an accessory.  He's getting –
     David was the one who planned it.  You didn't have no planned
5    part in it or nothing like that.  Now –

6

7    Cobb:  Travece, I just want you to stay with me.

8    [LeTourneau]:  I am going to stick with you.  I want you to – when
     he comes back in here just, please, talk to him.  Tell him what you
9    told me.

10   Cobb:  What [unintelligible] the wrong thing to do.  I'm the
     murderer.
11

12   [LeTourneau]:  You are afraid.  Your friend just got shot.

     Cobb:  Uh, na-na-na-na-na.
13

14   [LeTourneau]:  He was pointing the gun at your face.  Now,
     Dennis is going to be here.

15   Cobb:  When?

16   [LeTourneau]:  Huh?

17   Cobb:  When?

18   [LeTourneau]:  I've got to call him.  He already knows we're here.

19   Cobb:  Go call him then.

20   [LeTourneau]:  Okay.  But if you talk – if you say, 'I don't want to
     talk to you.  I want to talk to an attorney,' they're going to take
21   you with what statement you did.  'I didn't do it.'  The D – this is
     the statement the D.A. is going to get.
22

23   Cobb.  Okay.

24   [LeTourneau]:  'I didn't do nothing.  I didn't do shit.  You guys are
     all a bunch of fucking liars and this and that.'  That's what they're
     going to get, and they're going to pin it all on you, and you're
25   going to wear it all by yourself with Cr[uz] and David get out free.
     They didn't do it.  They were there.  Pablo planned it, which is not
26   true, because you didn't say shit.

recording made in Cobb's interview room and the accompanying transcript that about an hour after declaring he wished the interview to stop, Cobb agreed to talk to Detective Winton and initiated the conversation anew with the detective.

Specifically, after Cobb finished speaking with LeTourneau, Detective Winton came into the room and the following ensued:

"WINTON:  Okay, folks.  Are you ready to go?

"[LETOURNEAU]:  Okay.  He's ready, and he's going to talk to you, have you [unintelligible].

"WINTON:  You want – you want to talk to me now?

"COBB:  Can I – can I talk to you with a lawyer or I have to talk to you?

"WINTON:  If you want to talk to a lawyer it ends right now, right now, and I take you across the street.  That's how it goes.

"COBB:  All right.

"[LETOURNEAU's Grandmother]:  [Unintelligible], you can talk to a lawyer.  Let me tell you.

"COBB:  Well, I want to talk to you [indicating Winton].

"[LETOURNEAU's Grandmother]:  If you talk to the lawyer then you cannot talk.  The – the lawyer is not going to let you talk, okay?

"[LETOURNEAU]:  Well, the statement you gave him is going to be it.

"COBB:  I just want to talk to [indicating Winton] –

"[LETOURNEAU's Grandmother]:  Uh, you know what?  You know what?  You gonna get hurt, and you gonna say [unintelligible] family, and I told you if you something of a man you don't want to be [unintelligible] my daughter [unintelligible]. Okay.

---

Cobb.  All right.

[LeTourneau]:  Now, he gets back in here and you tell him . . . . Now you talk to him.

Cobb:  I will talk to him."

14

1    "COBB:  Yeah.  I want to talk to him [indicating Winton]."

2    Detective Winton then re-administered the *Miranda* warnings.
     After Cobb verified that he understood those rights and indicated
3    that he nonetheless wished to talk, he admitted shooting Godinez.

4    Opinion at 11-19.

5                      **b.  Were petitioner's statements taken in violation of Miranda?**

6        Petitioner claims that his statements to police were obtained in violation of *Miranda* and

7    should not have been admitted at his trial.  He argues that the "*Miranda* safeguards" were

8    violated in the following particulars: (1) Detective Winton continued questioning petitioner even

9    though he invoked his right to remain silent three separate times; (2) Detective Winton violated

10   the "clarification rule" after petitioner invoked his right to counsel; and (3) Detective Winton

11   improperly told Travece LeTourneau (LeTourneau) that petitioner would "hurt himself" by

12   invoking his rights to counsel and to remain silent with the expectation that LeTourneau would

13   pass this advice on to petitioner.  Pet. at 2.

14                           **I.  State Court Opinion**

15       The California Court of Appeal rejected petitioner's arguments in this regard, reasoning

16   as follows:

17       Cobb first contends that his *Miranda* rights were violated when
         Detective Winton refused to cease his questioning after Cobb
18       invoked his right to halt the interrogation.  Cobb argues that "the
         transcript shows that on three occasions [defendant] announced
19       that he no longer wished to speak to Detective Winton and on each
         of those occasions Winton disregarded [defendant's] expressed
20       desire to remain silent and continued to engage in interrogation or
         the functional equivalent of interrogation."
21
         As we will show, the flaw in defendant's position is that regardless
22       of any failure by the police to respect defendant's purported
         assertion of his right to halt the interrogation, defendant did not
23       make his confession until after the police halted the interrogation,
         defendant had spoken with his girlfriend and her grandmother, and
24       defendant had initiated further discussions.  Further, the confession
         was only made after defendant was re-administered his *Miranda*
25       rights, and he waived them.  Therefore, the confession was not
         invalidated by any prior violation of *Miranda*.  (*Oregon v. Elstad*
26       (1985) 470 U.S. 298 [84 L.Ed.2d 222].)

                                          15

* * *

Defendant argues that "Detective Winton's repeated violations of *Miranda* protocols [during the first interview] served to taint [defendant's] ultimate confession notwithstanding that Winton provided *Miranda* admonitions a second time before [defendant] actually confessed."

But even if Detective Winton violated *Miranda* during the first interview, that violation did not taint the subsequent confession, which was obtained in accordance with *Miranda*.

First, even though Cobb asserted his right to halt the interview, which was ultimately terminated, law enforcement was entitled to further interrogate him if he *initiated* further communications with the police. (*See Oregon v. Bradshaw* (1983) 462 U.S. 1039 [77 L.Ed.2d 405]; *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386].)

In *Edwards v. Arizona, supra,* 451 U.S. at pages 484-485 [68 L.Ed.2d at p. 386], the United States Supreme Court held that once an accused has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication,* exchanges, or conversations with the police." (Italics added.)

In this case, Cobb invoked his right to silence, but thereafter initiated further communications with Detective Winton following an hour break; his *Miranda* warnings were re-administered; and he made an intelligent waiver of his rights. Where a defendant, after invoking his right to silence, "thereafter initiates a statement to police, 'nothing in the Fifth and Fourteenth Amendments . . . prohibit[s] the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.' [Citation.] Moreover, if the defendant's statement is not only voluntary, but constitutes a knowing and intelligent waiver of his right to see counsel, the interrogation may resume. [Citation.]" (*People v. Bradford, supra,* 14 Cal.4th at p. 1034, quoting from *Edwards v. Arizona, supra,* 451 U.S. at pp. 482, 485-486 [68 L.Ed.2d at pp. 384-385, 387]; *see also Oregon v. Bradshaw, supra,* 462 U.S. at pp. 1045-1046 [77 L.Ed.2d at pp. 412-413].)

Second, any violation of *Miranda* during the first interview did not taint the subsequent confession that was obtained in accordance with *Miranda*. In *Oregon v. Elstad, supra,* 470 U.S. 298 [84 L.Ed.2d 222], the United States Supreme Court ruled that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who

16

has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.  In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights."  (470 U.S. at p. 314 [84 L.Ed.2d at p. 235].)

Thus, in *Oregon v. Elstad, supra,* 470 U.S. 298 [84 L.Ed.2d 222], the failure to give the 18-year-old defendant his *Miranda* warnings before he confessed to a burglary when officers came to arrest him at his residence did not taint his subsequent confession at the sheriff's office after being read his rights and agreeing to speak with the officers.  The Supreme Court explained that although "*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm" (470 U.S. at p. 307 [84 L.Ed.2d at p. 231]), "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.  Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  (470 U.S. at p. 309 [84 L.Ed.2d at p. 232].)  The United States Supreme Court recently reaffirmed this rule in *Dickerson v. United States* (2000) 530 U.S. 428 [147 L.Ed.2d 405, 418] in the course of its conclusion that *Miranda* was a constitutional decision that may not be overruled by an Act of Congress.

In this case, any purported violation of *Miranda* during the first interview did not taint that subsequent and informed waiver of Cobb's rights that preceded his confession, which followed his conference with his girlfriend and her grandmother.  The fact that the initial confession in *Oregon v. Elstad, supra,* was given without any warnings, while warnings were given in this case, but the *Miranda* rule was arguably violated when the interview was not terminated, actually makes this case a stronger one for upholding the confession than *Oregon v. Elstad.*  After all, Cobb was made aware of his rights in the case, unlike the defendant in *Oregon v. Elstad.*  Further, no confession resulted from the purported violations of *Miranda* here.  In contrast, in *Oregon v. Elstad,* it was contended that "the unwarned remark compromised the voluntariness of [the defendant's] later confession" because the wrongfully procured admission seemingly constrained defendant's subsequent statements.  (470 U.S. at p. 309 [84 L.Ed.2d at p. 232].)  In rejecting that point, the United States Supreme Court in *Oregon v. Elstad* explained:  "But endowing the psychological effects of *voluntary* admissions with constitutional implications would, practically speaking, disable the police from obtaining the

17

suspect's informed cooperation even when the official coercion proscribed by the Fifth Amendment played no part in either his warned or unwarned confessions."  (470 U.S. at p. 311 [84 L.Ed.2d at p. 233, original italics].)  The same applies here.

While *Oregon v. Elstad* did suggest that "deliberately coercive or improper tactics in obtaining the initial statement" (470 U.S. at p. 314 [84 L.Ed.2d at p. 235]) would require a different analysis, that qualification cannot be applied here for two reasons.  First, there was no confession that was obtained as a result of the purported *Miranda* violations here.  There was nothing said that could give rise to the "fruit of the poisonous tree," which would taint the confession obtained during the second interview.[10]  Second, regardless of whether Winton's continued interview of Cobb was a violation of *Miranda*, Cobb's continued comments and refusal to confess demonstrated that his will had not been overcome during the first interview.  (*See People v. Hogan* (1982) 31 Cal.3d 815, 841, disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)  Thus, for this reason, too, the exception to the rule in *Oregon v. Elstad* would not apply here.  And third, defendant never argued that the failure to terminate the first interview in accordance with *Miranda* made the second interview coercive.  (His argument that the confession was involuntary is based on different grounds. . .).  Thus, the trial court made no findings on this point, and it is therefore waived.  (citations omitted.)

*Collazo v. Estelle* (9th Cir. 1991) 940 F.2d 411, cited by defendant, is not contrary to our conclusions.  Cobb argues that the Ninth Circuit's decision in *Collazo v. Estelle* is "directly on point" in connection with "Detective Winton's repeated violations of *Miranda* protocols serv[ing] to taint [defendant's] ultimate confession . . . ."  But in *Collazo v. Estelle, supra,* the issue was whether defendant's confession following a second interrogation "was the product of the *coercive* statements made by the police during the first, illegal interrogation."  (940 F.2d at p. 420, italics added.)  The Ninth Circuit did not even address *Oregon v. Elstad, supra,* which, as noted, governs the legality of a second statement where an earlier statement was obtained in violation of *Miranda*.  In *Collazo v. Estelle*, the Ninth Circuit concluded that an officer's threats about "things 'going worse'" for the suspect if he sought a lawyer and did not cooperate "were a primary motivating factor in his about-face and decision to talk without counsel," despite the fact that the suspect had requested to talk to a lawyer.  (940 F.2d at p. 422.)  Thus, it was a threat, and thus coercion, which tainted the

---

[10]  Indeed, even where a subsequent confession follows an initial confession that resulted from improper police conduct, the prosecution only bears the burden of establishing "a break in the causative chain between the first confession and the subsequent confession."  *People v. Sims,* 5 Cal.4th 405, 445 (1993).

1          subsequent confession.  Cobb here did not request a lawyer during
         the first interview, and Detective Winton did not threaten him.

2

3          In sum, any *Miranda* violations during the first interview did not
         taint the confession during the second interview.

4 Opinion at 12, 20-26.

5                       **ii. Legal Standards**

6      "The prosecution may not use statements, whether exculpatory or inculpatory, stemming

7 from custodial interrogation of the defendant unless it demonstrates the use of procedural

8 safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384

9 U.S. at 444.  To this end, custodial interrogation must be preceded by advice to the potential

10 defendant that he has the right to consult with a lawyer, the right to remain silent and that

11 anything he says can be used in evidence against him.  *Id.* at 473-74.  *Miranda* warnings are "not

12 themselves rights protected by the Constitution but [are] instead measures to insure that the right

13 against compulsory self-incrimination [is] protected."  *Oregon v. Elstad*, 470 U.S. at 305

14 (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)).

15      Once *Miranda* warnings have been given, if a suspect makes an unambiguous statement

16 invoking his constitutional rights, "all questioning must cease."  *Smith v. Illinois,* 469 U.S. 91, 98

17 (1984).  *See also Miranda*, 384 U.S. at 473-74; *Michigan v. Mosley*, 423 U.S. 96, 100 (1975).

18 Any subsequent statements are relevant only to the question whether the accused waived the

19 right he had previously invoked.  *Smith*, 469 U.S. at 98.  "Invocation and waiver are entirely

20 distinct inquiries, and the two must not be blurred by merging them together."  *Id.*

21      Invocation of the right to remain silent must be construed liberally.  *See Hoffman v.*

22 *United States*, 341 U.S. 479, 486 (1951).  Thus, a suspect need not rely on any special

23 combination of words to invoke the right to silence.  *Quinn v. United States,* 349 U.S. 155, 162

24 (1955).  *See also Miranda*, 384 U.S. at 473-74 (a suspect's assertion of the right to remain silent

25 "in any manner" compels the police to cease questioning).  In order to determine whether a

26 suspect invoked his Fifth Amendment rights, "a court should examine the entire context in which

1   the claimant spoke." *Bradley v. Meachum*, 918 F.2d 338, 342 (2d Cir. 1990) (quoting *United*

2   *States v. Goodwin*, 470 F.2d 893, 902 (5th Cir. 1972)).

3      The United States Supreme Court has rejected an automatic proscription of any further

4   interrogation once the person questioned has indicated a desire to remain silent.  *Mosley*, 423

5   U.S. at 102-03 (rejecting the proposition that the *Miranda* decision barred law enforcement

6   officials from ever questioning a suspect after the suspect had invoked his right to remain silent).

7   Accordingly, voluntary statements later initiated by the suspect are not per se inadmissible.

8   *Miranda*, 384 U.S. at 478 ("[v]olunteered statements of any kind are not barred by the Fifth

9   Amendment").  However, the admissibility of statements obtained after the person in custody has

10  decided to remain silent depends under *Miranda* on whether the suspect's 'right to cut off

11  questioning' was 'scrupulously honored.'"  *Mosley*, 423 U.S. at 104.  *See also United States v.*

12  *Hsu*, 852 F.2d 407 (9th Cir. 1988) (defendant's Fifth Amendment rights were not violated when

13  police readministered *Miranda* warnings and resumed questioning on same crime approximately

14  30 minutes after defendant had invoked his right to remain silent); *United States v. Andrade*, 135

15  F.3d 104 (1st Cir. 1998) (no Fifth Amendment violation where defendant was advised of his

16  Miranda rights and invoked his right to remain silent but spoke to the officers several hours later

17  after his sister called him at the officers' request and implored him to do so).

18      With respect to the right to counsel, a suspect  must "unambiguously request counsel,"

19  which means that the suspect "must articulate his desire to have counsel present sufficiently

20  clearly that a reasonable police officer in the circumstances would understand the statement to be

21  a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994).[11]  Where there has

22  been an equivocal assertion of the right to counsel, the attending officer *may* ask questions to

23  clarify the defendant's wishes, but only so long as he does not continue a general interrogation.

24

25      [11]  The United States Supreme Court has not specifically imported the demanding *Davis*
    standard for invocation of the right to counsel into the right-to-silence context.  *See Bui v.*
26  *DiPaolo*, 170 F.3d 232, 239 (1st Cir. 1999).

1    *Id.* at 461 (concluding that the statement, "Maybe I should talk to a lawyer," is not necessarily a

2    request for counsel and noting that "when a suspect makes an ambiguous or equivocal statement

3    it will often be good police practice for the interviewing officers to clarify whether or not he

4    actually wants [to invoke the privilege]".)  However, the police are not required to ask clarifying

5    questions, and "[i]f the suspect's statement is not unambiguous or unequivocal . . . the officers

6    have no obligation to stop questioning."  *Id.* at 461-62.

7         The Supreme Court has established a "bright-line rule" that all questioning must cease

8    once a request for counsel is made.  *Edwards v. Arizona*, 451 U.S. at 485.  If the accused clearly

9    invokes his right to counsel, courts may admit his responses to further questioning only on

10   finding that he (a) initiated further discussions with the police, and then (b) knowingly and

11   intelligently waived the right he had invoked.  *Id.* at 485-86.  *See also Wyrick v. Fields*, 459 U.S.

12   42, 45-46 (1982) (per curiam) (before a suspect in custody can be subjected to further

13   interrogation after requesting an attorney there must be a showing that the "suspect himself

14   initiates dialogue with the authorities").  A valid waiver of the right to counsel cannot be

15   established by showing only that the suspect responded to further "police-initiated" custodial

16   interrogation even if he has been advised of his rights.  *Edwards*, 451 U.S. at 484.  Waivers of

17   the right to counsel must not only be voluntary, but must also constitute a knowing and

18   intelligent relinquishment or abandonment of the right.  *Id.* at 482.

19        Finally, where an involuntary confession is improperly admitted into evidence at trial, a

20   reviewing court must apply a harmless error analysis, assessing the error "in the context of other

21   evidence presented in order to determine whether its admission was harmless beyond a

22   reasonable doubt."  *Arizona v. Fulminante*, 499 U.S. 279, 308 (1991).  In the context of habeas

23   review, the standard is whether the error had substantial and injurious effect or influence in

24   determining the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Beatty v.*

25   *Stewart*, 303 F.3d at 975, 994 (2002); *Henry v. Kernan,* 197 F.3d 1021, 1029 (9th Cir. 1999).

26   ////

21

1    The analysis must be conducted with an awareness that "a confession is like no other evidence,"

2    and that "a full confession may have a 'profound impact' on the jury." *Fulminante,* 499 U.S. at

3    296.

4                                        **iii.  Analysis**

5           Petitioner's interrogation may be broken down into three separate parts.  It is essentially

6    undisputed that at the first phase of the interrogation, petitioner received *Miranda* warnings and

7    refused to waive them, invoking his right to remain silent three times.  Ultimately, the

8    interrogation was terminated without petitioner having incriminated himself in any way, and

9    petitioner was told that he would be placed under arrest.  In the second phase of the

10   interrogation, LeTourneau entered the room and talked petitioner into cooperating with Detective

11   Winton in order to prevent him from taking the blame for the killing.  In the third and final part

12   of the interrogation, the petitioner's girlfriend and then petitioner, told Detective Winton

13   petitioner wanted to talk.  Petitioner then received *Miranda* warnings for the second time,

14   waived his right to remain silent, and confessed.

15          With regard to the first part of the interview, the state appellate court found no

16   constitutional violation because the interrogation was preceded by the giving of *Miranda*

17   warnings, was terminated in response to petitioner's refusal to cooperate, and was reopened only

18   after petitioner informed Winton that he wanted to talk to him.  The state court also found that

19   petitioner's ultimate confession was not tainted by any *Miranda* violation which may have

20   occurred during the first part of the interrogation, noting that petitioner's will was not

21   "overborne" and that he did not make any statements at that time.

22          This court agrees with the conclusion reached by the California Court of Appeal.  It is

23   true that Detective Winton did not "scrupulously honor" petitioner's request to remain silent

24   during the first portion of the interview, but continued to question him after he stated he did not

25   want to talk.  However, contrary to the situation in *Elstad* and *Collazo*, there is no evidence of

26   any police coercion and the interrogation did not lead to any incriminating statements which

                                                   22

1    might have tainted the voluntariness of petitioner's later confession.  Thus, because petitioner

2    made no statements in response to the initial *Miranda* violation, and because his confession was

3    obtained pursuant to a voluntary and knowing waiver of his constitutional rights, there is no

4    constitutional impediment to admitting the confession into evidence.  Put another way, even if

5    *Miranda* violations occurred during the first phase of petitioner's interrogation, any possible

6    "taint" was dissipated prior to petitioner's confession by the re-administration of *Miranda*

7    warnings and petitioner's waiver of his constitutional rights.  *See Elstad*, 470 U.S. at 309-311.

8    Petitioner's invocation of the right to remain silent at the first phase of his interrogation did not

9    prevent the police from later listening to his voluntary statements.  *Miranda*, 384 U.S. at 104.[12]

10           Petitioner also claims that his confession was obtained in violation of his right to counsel.

11   The California Court of Appeal rejected this argument as well, reasoning as follows:

12            Hence, Cobb's confession during the second interview was not
              procured illegally unless *Miranda* was violated during that
13            interview, or the statement was involuntary.  We address Cobb's
              next *Miranda* claim here.

14

15

16   [12]   This court notes that the fruit of the poisonous tree doctrine does not operate in the
     *Miranda* context in the same way that it does in the Fourth Amendment context.  *See Elstad*, 470
17   U.S. at 306-09.  The fruit of the poisonous tree doctrine operates in the Fifth Amendment context
     as follows: if the defendant's pre-*Miranda* statement was coerced in violation of the Fifth
18   Amendment, then the court must suppress the defendant's post-*Miranda* statement unless the
     post-Miranda statement was sufficiently attenuated from the coercion to remove any "taint."  *See*
19   *United States v. Wauneka*, 770 F.2d 1434, 1440 (9th Cir. 1985).  "If, on the other hand, the prior
     statement was voluntary in the sense that it was not coerced in violation of the [F]ifth
20   [A]mendment, though obtained in technical violation of the Miranda requirements, the court
     should suppress the statement given after the Miranda warning only if the court finds that the
21   subsequent statement was not voluntarily made."  *Id.*  In *Missouri v. Seibert*, 542 U.S. 600
     (2004), the United States Supreme Court held that a trial court must suppress postwarning
22   confessions obtained during a deliberate two-step interrogation whereby police begin a custodial
     interrogation without advising the suspect of his *Miranda* rights, obtain incriminating statements,
23   and then continue questioning after administering warnings in order to re-elicit the incriminating
     statements.  Under those circumstances, the Supreme Court held that the warning finally given
24   was objectively ineffective because it did not effectively apprise the defendant that she had a
     "genuine choice whether to follow up on her earlier admission."  *Id.* at 616.  (Souter, J., plurality
25   opinion).  Here, unlike the situation in *Seibert*, petitioner was given *Miranda* warnings at the
     beginning of the interrogation and did not make any statements at all until LeTourneau
26   convinced him to change his mind and cooperate with Detective Winton.  Accordingly, *Seibert*
     does not control the outcome in this case.

As mentioned, after Cobb finished speaking with LeTourneau, the latter told Detective Winton that Cobb was "going to talk to you . . . ." Cobb then asked Winton whether he could "talk to you with a lawyer" or whether he "ha[d] to talk to you." Detective Winton answered, "If you want to talk to a lawyer it ends right now, right now, and I take you across the street. That's how it goes." After a discussion with LeTourneau and her grandmother – without any participation by Detective Winton – Cobb said that he would talk to Winton, and Winton readministered the *Miranda* warnings.

Cobb now argues that "Detective Winton's response to [defendant's] question about a lawyer – 'If you want to talk to a lawyer it ends right now, right now, and I take you [to jail]' – was not properly responsive to [defendant's] question." Cobb therefore contends that "Detective Winton violated the 'clarification rule,'" and that "[o]nce [defendant] expressed his confusion, Winton was entitled to 'continue talking [only] for the purpose of obtaining clarification of [defendant's] intentions.'"

When an accused initiates further dialogue and interrogation follows, the People have the burden of showing that "subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." (*Oregon v. Bradshaw, supra,* 462 U.S. at p. 1044 [77 L.Ed.2d 405, 412].) In this case, Cobb made his confession only after Winton re-administered the *Miranda* warnings and Cobb unequivocally waived his right to counsel. Cobb's claim of a violation of the "clarification rule" does not change this.

The "clarification rule," described by the Court of Appeal in *People v. Carey* (1986) 183 Cal.App.3d 99, provides that that (sic) if a suspect's invocation of *Miranda* rights is ambiguous, the police may continue talking with him only for the limited purpose of clarifying whether he intended to invoke *Miranda*. (*Id.* at pp. 102-103.)

However, subsequent to the California Court of Appeal's decision in *People v. Carey, supra,* 183 Cal.App.3d 99, the United States Supreme Court in *Davis v. United States* (1994) 512 U.S. 452, 456, 461 [129 L.Ed.2d 362, 369, 373], rejected the approach that a custodial defendant's ambiguous comments regarding counsel only permit clarifying questions. It ruled that "when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity,' [citation], because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present . . . . [¶] We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who – because of fear,

24

intimidation, lack of linguistic skills, or a variety of other reasons – will not clearly articulate their right to counsel although they actually want to have a lawyer present.  But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." (512 U.S. at p. 460 [129 L.Ed.2d at p. 372].)

Thus, in *Davis v. United States, supra,* the United States Supreme Court did not disturb the lower court's conclusion that the petitioner's comment did not constitute a request for counsel where the petitioner remarked, "Maybe I should talk to a lawyer." (512 U.S. at p. 462 [129 L.Ed.2d at p. 373].)  The high court concluded: "[W]e decline to adopt a rule requiring officers to ask clarifying questions.  If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." (512 U.S. at pp. 461-462 [129 L.Ed.2d at p. 373].)

Since the California Constitution is not to be construed to afford greater rights to criminal defendants than those afforded by the United States Constitution (Cal. Const. art. I, §24), there was no "clarification rule" to be violated here.

Accordingly, we reject Cobb's contention that his confession was somehow unlawful because of a violation of the now defunct "clarification rule."  When Cobb reinitiated further dialogue, he asked whether he could talk to Winton with a lawyer, and Winton told him that if he wanted to talk to a lawyer "it ends right now, right now, and I take you across the street."  Winton had no obligation to stop the questioning based on that question under *Davis v. United States, supra,* 512 U.S. at pp. 461-462 [129 L.Ed.2d at p. 373], because it was not "an unambiguous or unequivocal request for counsel."  In any event, Detective Winton did not begin to pose substantive questions to Cobb until Cobb unequivocally stated that he wanted to talk to Winton, Winton had re-administered *Miranda* admonitions, and Cobb unambiguously waived his right to counsel.  Finally, Winton's response did not imply that Cobb would "be penalized if he insist[ed] upon his right to consult counsel," as contended by Cobb (as was the case in *Collazo v. Estelle, supra,* 940 F.2d 411, where the officer impermissibly threatened the defendant that things would get "worse" if he sought the lawyer that he requested).  Cobb knew he was already under arrest for Godinez's murder; the fact that a decision to wait for his attorney meant going "across the street" did not imply that he would suffer a greater penalty from the exercise of his right to counsel and as a practical matter, Winton was right that Cobb's retention of counsel would end the interview.

There was no error.

1    Opinion at 26-29.

2         As discussed above, an invocation of the right to counsel, if it is to be effective, must be

3    unambiguous as well.  *See Davis*, 512 U.S. at 459.  Although a request for counsel need not be

4    stated as a model of eloquence and clarity in order to qualify as an unequivocal invocation of the

5    right to counsel, "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some

6    statement that can reasonably be construed to be an expression of a desire for the assistance of an

7    attorney.' *Id.* (citation omitted); *see also Paulino v. Castro*, 371 F.3d 1083, 1087 (9th Cir. 2004);

8    *United States v. de la Jara*, 973 F.2d 746, 750 (9th Cir. 1992) (a suspect's words must be taken

9    "as ordinary people would understand them").  As the court stated in *Davis*, "reference to an

10   attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances

11   would have understood only that the suspect *might* be invoking the right to counsel . . . do[es]

12   not require the cessation of questioning." *Davis*, 512 U.S. at 459 (emphasis in original).  *Accord*

13   *Paulino*, 371 F.3d at 1087.

14        This court concludes that petitioner's statements did not constitute an unequivocal and

15   unambiguous request for counsel.  It was unclear from petitioner's question whether he actually

16   wanted an attorney or whether he was simply trying to clarify how to move forward with the

17   questioning.  Under those circumstances, a reasonable police officer could conclude that

18   petitioner only "'might' be invoking the right to counsel." *Cf. Davis*, 512 U.S. at 462 (finding

19   that the statement, "[m]aybe I should talk to a lawyer," was ambiguous, and hence was not a

20   request for counsel); *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) (defendant's

21   question, "[b]ut, excuse me, if I am right, I can have a lawyer present through all this, right?"

22   was insufficient to constitute an unambiguous request for counsel); *Clark v. Murphy*, 331 F.3d

23   1062, 1066 (9th Cir. 2003) (defendant's statement "I think I would like to talk to a lawyer" was

24   ambiguous, and therefore the police were not required to cease questioning); *Diaz v. Senkowski*,

25   76 F.3d 61, 63 (2d Cir. 1996) (suspect's statements "I think I want a lawyer" and "[d]o you think

26   I need a lawyer" were ambiguous within the meaning of *Davis*); *United States v. Ogbuehi*, 18

26

F.3d 807, 813 (9th Cir. 1994) (defendant's question, "Do I need a lawyer" or "Do you think I need a lawyer" does not "rise to the level of even an equivocal request for an attorney").[13]  The court also notes that after petitioner asked whether he had to talk to Winton "with a lawyer or I have to talk to you," LeTourneau and her grandmother reminded petitioner that he would be unable to tell his side of the story if he obtained a lawyer.  Petitioner then told Winton twice that he wanted to talk with him alone.  At that point, it became perfectly clear that petitioner did not want an attorney present while he spoke to Detective Winton.  Because petitioner did not unequivocally request an attorney at any point during the interrogation, Detective Winton was not required to cease his questioning.  *Davis*, 512 U.S. at 462 ("[u]nless the suspect actually requests an attorney, questioning may continue").

The state court's decision with respect to the claims described above did not involve an unreasonable application of clearly established federal law as determined in *Miranda* and its Supreme Court progeny.  Accordingly, petitioner is not entitled to relief on these claims.[14]

### c.  Were petitioner's statements involuntary and coerced?

Petitioner also claims that his right to due process was violated when the trial court admitted into evidence his involuntary statements to police.  Petitioner argues that his statements were made involuntarily because: (1) Detective Winton continued questioning petitioner even

---

[13]  *But see Smith v. Illinois*, 469 U.S. 91, 97 (1984) (deeming a suspect's statement, "Uh, yeah, I'd like to do that," upon hearing of his right to counsel a clear invocation); *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999) (finding that the questions "Can I get an attorney right now, man?" "You can have attorney right now?" and "Well, like right now you got one?" when read together, constituted an unambiguous request for counsel); *de la Jara*, 973 F.2d at 750 (deeming "Can I call my attorney?" or "I should call my lawyer" a clear invocation of the right to counsel); *Robinson v. Borg*, 918 F.2d 1387, 1389 (9th Cir.1990) (deeming "I have to get me a good lawyer, man. Can I make a phone call?" a clear invocation of the right to counsel); *Shedelbower v. Estelle*, 885 F.2d 570, 571-73 (9th Cir.1989) (deeming "You know, I'm scared now.  I think I should call an attorney" a clear invocation of the right to counsel); *Smith v. Endell*, 860 F.2d 1528, 1529-31 (9th Cir. 1988) (deeming "Can I talk to a lawyer?" a clear invocation of the right to counsel).

[14]  Petitioner's arguments with respect to the alleged manipulation of LeTourneau will be addressed in connection with petitioner's claim that his confession was involuntary and coerced.

though he invoked his right to silence three separate times; (2) Detective Winton violated the

"clarification rule" after petitioner invoked his right to counsel; (3) Detective Winton

deliberately gave false advice to Travece LeTourneau with the expectation that she would pass

this advice on to petitioner; (4) Detective Winton engaged in "relentless interrogation,

disregarding petitioner's protestations of innocence and repeated efforts to terminate the

interview;" (5) Detective Winton falsely implied that petitioner would receive a lesser

punishment if he admitted his role in the crimes; and (6) petitioner was susceptible to undue

police pressure because he was "relatively youthful and unsophisticated in the ways of the law."

Pet. at 3.

## I.  State Court Opinion

The California Court of Appeal rejected petitioner's arguments in this regard, reasoning

as follows:

### 1.  The Alleged "manipulation" of LeTourneau

Cobb contends that Detective Winton impermissibly manipulated LeTourneau by "provid[ing] her with faulty legal advice and disinformation," including that Avila and Reynoso had told the police of Cobb's involvement.  He argues that it "defies all reason, logic and credibility to accept the prosecution's position that the 18-year-old LeTourneau, on her own and not based upon the counsel of Detective Winton, came up with the idea of advising [him] that it was extremely important for him to confess to the police right then and there before he had an opportunity to consult with a lawyer."

The question of whether LeTourneau was directed by Detective Winton to urge Cobb to confess, or otherwise manipulated by Winton, was necessarily resolved against Cobb by the trial court, based upon its assessment of LeTourneau's credibility.

The scope of our review of a claim that the trial court erred in its determination that an admission or confession was voluntary is well established.  "We must accept the trial court's resolution of disputed facts and inferences, *and its evaluations of credibility*, if they are substantially supported [citations]."  (Emphasis added, *People v. Boyer* (1989) 48 Cal.3d 247, 263, disapproved on other grounds in *People v. Stansbury* (1993) 9 Cal.4th 824, 830 fn. 1; *People v. Celestine* (1992) 9 Cal.App.4th 1370, 1373.)

LeTourneau testified at the hearing on Cobb's motion to suppress that Detective Winton told her in their second conversation that because Cobb was being uncooperative, he alone would face a murder charge, while Avila and Reynoso would be either "set free" or subject to prison terms of between two and twelve years. She testified that Winton urged her to "go in there and speak with [Cobb]" and "convince him" to talk to police, because this "was his last chance to tell" his version of events. LeTourneau's grandmother corroborated LeTourneau's testimony that Detective Winton urged LeTourneau to "tell [Cobb] to cooperate."[15]

But Detective Winton denied urging LeTourneau to ask Cobb questions or to persuade Cobb to confess or cooperate. At most, Winton testified, he honored LeTourneau's repeated requests to speak to Cobb. Indeed, he testified that LeTourneau asked for additional time, and he told her she had only two more minutes because he needed to "move on here." Winton also denied telling LeTourneau that unless Cobb confessed, he would get a sentence of 25 to life, while Avila and Reynoso would receive only a few years – although he admitted that his statements to her that Avila and Reynoso had blamed Cobb for the shooting were untrue.

The trial court resolved this credibility contest in favor of Detective Winton. It found that LeTourneau was neither asked to encourage Cobb to confess nor coerced into doing so, and it expressly found LeTourneau's testimony to the contrary was not credible. It found that the detective was more credible than LeTourneau because, inter alia, her testimony conflicted with her statements on the tape, and she had an obvious bias in favor of Cobb. Substantial evidence supports the trial court's resolution.

Of course, an appellate court will not uphold a judgment or verdict based upon "inherently improbable" evidence. (citation omitted.) But "'"[t]o warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony, which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]"'"

---

[15] LeTourneau further testified that Winton said that if Cobb failed to cooperate, she would be charged as an accessory to murder after the fact and sent to jail until her baby was delivered. LeTourneau's grandmother also testified that Winton threatened to "charge [LeTourneau] with accessory after the fact or something like that." Winton denied telling LeTourneau that she would be arrested, or that she would have her child in jail, although he admitting (sic) telling her that "people in a position of helping out somebody covering a felony" could be liable as accessories.

1

(*Ibid.*)

2

In this case, because Detective Winton's testimony about his
interview with LeTourneau is neither physically impossible,
patently false, nor inherently improbable, we cannot reject it.

3

4

Finally, although Detective Winton falsely claimed that Avila and
Reynoso had blamed Cobb, that did not make Cobb's confession
involuntary because a deception does not render a defendant's
statements inadmissible where "it was not of a type reasonably
likely to procure an untrue statement." (citation omitted.)

5

6

7

**2. Claims of Alleged "Relentless Interrogation," and Implied
Promises of Leniency Are Waived**

8

9

Cobb contends for the first time on appeal that his statement must
be adjudged involuntary because he was subjected to an
unconstitutionally "relentless" interrogation and that Detective
Winton impliedly promised that if Cobb confessed, his guilt would
be mitigated by the facts that he did not initiate the robbery of
Godinez but shot Godinez only to protect his friends. Therefore,
Cobb claims, "Detective Winton improperly misled [him] into
thinking his punishment would be mitigated by his convincing
authorities that he came into the robbery plan late or that he shot
Godinez to defend his friends."

10

11

12

13

14

But all Detective Winton said is: "It's different when you're there.
You get pulled into something that you didn't mean to get pulled
into. It's different when you're there, and you think you guys are
going to do one thing and something else happens, okay?"

15

16

Those statements do not constitute a promise of leniency. (*See
People v. Ray, supra,* 13 Cal.4th at pp. 339-340; *see also People v.
Benson* (1990) 52 Cal.3d 754, 780-781; *In re Shawn D., supra,* 20
Cal.App.4th at p. 214.) Further, a promise of leniency or
advantage to the accused must be a motivating cause of the
confession to make it inadmissible (*People v. Ray, supra,* 13
Cal.4th at p. 339), and that was not the case here since Cobb did
not confess in response to that statement, but ultimately terminated
the interview.

17

18

19

20

21

In any event, Cobb may not raise claims on appeal concerning the
involuntary nature of his statements unless he has tendered the
same arguments in the trial court. He did not raise these
contentions in the trial court. Accordingly, these claims are
waived. (citations omitted.) When a defendant has failed to tender
below an argument supporting his assertion that a statement to
police was involuntary, we must conclude that the parties "had no
incentive to fully litigate this theory below, and the trial court had
no opportunity to resolve material factual disputes and make
necessary factual findings. Under such circumstances, a claim of

22

23

24

25

26

30

1    involuntariness generally will not be addressed for the first time on
     appeal."  (citations omitted.)

2

3    Opinion at 31-35.

4                              **ii.  Legal Standards**

5        The Constitution demands that confessions be made voluntarily.  *See Lego v. Twomey*,

6    404 U.S. 477, 483-85 (1972).  Involuntary confessions may not be used to convict criminal

7    defendants because they are inherently untrustworthy and because society shares "the

8    deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life

9    and liberty can be as much endangered from illegal methods used to convict those thought to be

10   criminals as from the actual criminals themselves."  *Spano v. New York*, 360 U.S. 315, 320-21

11   (1959) .  A confession is voluntary only if it is "'the product of a rational intellect and a free

12   will.'"  *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372

13   U.S. 293, 307 (1963)).  *See also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  "The line of

14   distinction is that at which governing self-direction is lost and compulsion, of whatever nature or

15   however infused, propels or helps to propel the confession."  *Collazo v. Estelle*, 940 F.2d 411,

16   416 (9th Cir. 1991) (en banc) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  *See*

17   *also Henry*, 197 F.3d at 1027.  Voluntariness is to be determined in light of the totality of the

18   circumstances.  *See Miller v. Fenton*, 474 U.S. 104, 111 (1985); *Haynes v. Washington*, 373 U.S.

19   503, 513 (1963); *Beatty*, 303 F.3d at 992.  In the end the court must determine under the totality

20   of the circumstances whether "the government obtained the statement by physical or

21   psychological coercion or by improper inducement so that the suspect's will was overborne."  *Id.*

22   at 992 (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).  *See also*

23   *Hutto v. Ross*, 429 U.S. 28, 30 (1976).

24       Officials cannot extract a confession "by any sort of threats or violence, nor . . . by any

25   direct or implied promises, however slight, nor by the exertion of any improper influence."

26   /////

                                                31

*Hutto*, 429 U.S. at 30 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).[16]  Neither

physical intimidation nor undue psychological pressure is permissible.  *United States v.*

*Haswood*, 350 F.3d 1024, 1027 (2003).  *See also Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)

(confession found to be coerced by officers' false statements that state financial aid for

defendant's infant children would be cut off, and her children taken from her, if she did not

cooperate); *Rogers v. Richmond*, 365 U.S. 534, 541-45 (1961) (defendant's confession was

coerced when it was obtained in response to a police threat to take defendant's wife into

custody); *Miranda*, 384 U.S. at 476 ("any evidence that the accused was threatened, tricked, or

cajoled into a waiver (of Fifth Amendment right to remain silent) will, of course, show that the

defendant did not voluntarily waive his privilege"); *United States v. Tingle*, 658 F.2d 1332, 1335

(9th Cir. 1981) ("subtle psychological coercion suffices . . . at times more effectively 'to

overbear a rational intellect and a free will'").  *But cf. Pollard v. Galaza*, 290 F.3d 1030, 1034

(9th Cir. 2002) ("misrepresentations made by law enforcement in obtaining a statement, while

reprehensible, does not necessarily constitute coercive conduct").

　　　　Under circumstances involving police coercion, interrogation by third parties may result

in a Fifth Amendment violation.  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (police

interrogation includes a "practice that the police should know is reasonably likely to evoke an

incriminating response from a suspect").  However, there must be some causal connection

between the police conduct and the confession.  *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)

("[a]bsent police conduct causally related to the confession, there is simply no basis for

concluding that any state actor has deprived a criminal defendant of due process of law").

////

////

---

[16] This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel.  Rather, the promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances.  *See Hutto*, 429 U.S. at 30.

### iii.  Analysis

The trial court in this case found that LeTourneau did not act for the police department when she spoke to petitioner.  Specifically, the trial judge found "no evidence – no credible evidence that . . . Sergeant Winton specifically sent Travece in to, on purpose, elicit statements or that he told her what to say to Mr. Cobb."  RT at 112.  The judge rejected the testimony of LeTourneau when she stated that Detective Winton induced her to persuade petitioner to confess, finding her testimony unreliable and incredible.  *Id.* at 110-12.  The trial court's factual conclusion that LeTourneau did not act on behalf of the police when she questioned petitioner is not an unreasonable determination of the facts in this case and is entitled to a presumption of correctness under AEDPA.  *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir.1996).  *See also* 28 U.S.C. §2254(d)(2).  Put another way, the state appellate court did not act unreasonably in accepting the facts as found by the trial court.

Instead, the trial court relied on the testimony of Detective Winton, who testified that LeTourneau requested to speak to petitioner and was allowed to do so without any police involvement.  Under these circumstances, there is no basis for a finding of coercive police conduct.  *See Arizona v. Mauro*, 481 U.S. 520, 528 (1987) (police did not interrogate defendant in violation of the Fifth and Fourteenth Amendments when they allowed him to speak with his wife in the presence of a police officer because there was "no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements"); *United States v. Kimbrough*, 477 F.3d 144, 151 (and cases cited therein) (4th Cir. 2007) (police did not subject defendant to improper interrogation when they brought defendant's mother to the basement to see drugs stored there because there was "no evidence in the record of a tacit agreement, discussion, or understanding between the police officers and defendant's mother that

////

////

////

33

1   she would ask questions or attempt to elicit incriminating information").[17]

2          The trial judge also found that even if LeTourneau did act as a police agent, she did not

3   coerce petitioner to confess.  The judge stated, "telling someone to tell the truth without

4   promising any leniency is not – is not really coercive" and "telling them that they will feel better

5   is not coercive."  RT at 113, 114.  The judge also concluded that Detective Winton's false

6   statement to LeTourneau that Reynoso and Avila had implicated Cobb in the killing, standing

7   alone, did not render the circumstances coercive.  *Id.*  This conclusion is consistent with United

8   States Supreme Court precedent, which has refused to find that a defendant who confesses after

9   being falsely told that his codefendant has turned State's evidence has done so involuntarily,

10  where the totality of the circumstances indicates the confession was voluntarily made.  *Frazier v.*

11  *Cupp*, 394 U.S. 731, 739 (1969).[18]

12         The state appellate court also concluded that Detective Winton did not make an implied

13  promise of leniency if petitioner would admit his role in the crimes.  In this regard, Detective

14  Winton's exact words to petitioner were the following:

15                 You know, a lot of times we try to – we try – when we talk to
                   people we try to get them to help – to help themselves, okay?  And
16                 a lot of times, uh, like I spoke with your mom the other day, we

17                 don't want people to throw this whole thing on Pablo Cobb and
                   make him the bad guy in this whole thing.

18                                            * * *

19

20         [17]  The court in *Kimbrough* could find no cases "in which statements or confessions
       elicited through private questioning have been suppressed."  *Id.* at 150.
21

22         [18]  Petitioner does not appear to be arguing that the treatment LeTourneau received at the
       hands of the police violated her constitutional rights in any way.  In any event, any such claim
23     would fail.  A defendant generally does not have standing to complain about violations of the
       rights of third parties, unless the government's investigative methods were "offensive to a
24     civilized system of justice" or resulted in a fundamentally unfair trial.  *See Miller v. Fenton*, 474
       U.S. 104, 109 (1985); *Clanton v. Cooper*, 129 F. 3d 1147, 1157-58 (10th Cir. 1997)*; United*
25     *States v. Chiavola,* 744 F.2d 1271, 1273 (7th Cir. 1984).  That was not the case here.  Under the
       facts as found by the trial court, Detective Winton's treatment of LeTourneau did not compare to
26     the type of extreme treatment previously found to constitute a due process violation and did not
       render petitioner's trial fundamentally unfair.

                                             34

1
2
3
4
5
6
7
8

First day of the rest of your life Pablo, okay?  You can – if you can
live in your heart about what happened and your involvement in
this thing, and you're willing to sit there quietly and let somebody
else accuse you of being a big head – head to head part of this
whole thing, that's fine.  It's different when you're there.  You get
pulled into something that you didn't mean to get pulled into.  It's
different when you're there, and you think you guys are going to
do one thing and something else happens, okay?

* * *

It's different when you go in there seeing that a friend of yours is
getting hurt and stuff, and you're doing what all you can to keep
that guy from being killed.  I understand that.

9   Opinion at 16-17.  This court concludes, as did the California Court of Appeal, that these

10  statements were not coercive.  It is true that a promise of leniency accompanied by threats or

11  other coercive practices constitutes improper influence and may make a subsequent inculpatory

12  statement involuntary.  *See Tingle*, 658 F.2d at 1336.  However, Detective Winton did not

13  promise anything to petitioner or even hint that petitioner would receive favorable treatment in

14  his criminal case if he confessed.  At most, he expressed personal understanding of petitioner's

15  predicament.  Detective Winton's remarks do not rise to the level of even an implied promise of

16  leniency.

17      Nor was Detective Winton's statement accompanied by threats or other coercive

18  practices that would render a subsequent confession involuntary.  "[C]oercive police activity is a

19  necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the

20  Due Process Clause . . . ."  *Connelly*, 479 U.S. at 167.  Because petitioner's claim is solely that

21  the police induced his cooperation through false promises of leniency, this court cannot conclude

22  that the state courts' rulings were contrary to or an unreasonable application of federal law.  *See*

23  *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir.1994) ("[I]n most circumstances,

24  speculation that cooperation will benefit the defendant or even promises to recommend leniency

25  are not sufficiently compelling to overbear a defendant's will"); *Leon Guerrero*, 847 F.2d at 1366

26  (citations omitted) (an interrogating agent's promise to inform the government prosecutor about a

1  suspect's cooperation, even if accompanied by a promise to recommend leniency or by

2  speculation that cooperation would have a positive effect, would not render a subsequent

3  statement involuntary in the absence of threats or other coercive practices).

4      Further, even if Detective Winton implied that petitioner would fare better if he

5  confessed to his role in the events, the California Court of Appeal did not clearly err in finding

6  that petitioner's refusal to cooperate with Detective Winton during the first portion of the

7  interrogation demonstrates that his will was not overborne.  The fact that petitioner initially

8  refused to speak to Winton about the crime suggests that petitioner felt comfortable exercising

9  his free will and that there was no causal link between the purported promise of leniency and his

10  later confession.  In short, the evidence indicates that Winton did not make any specific promises

11  of leniency, let alone promises significant enough to overbear petitioner's will.

12      Finally, petitioner contends that his relative youthfulness and lack of experience with

13  "the ways of the law" contributed to the ability of the police to extract his involuntary

14  confession.  Pet. at 3.  The United States Supreme Court has observed that juvenile defendants

15  are generally more susceptible to police coercion than adults and that a defendant's "maturity" is

16  one of the factors used to determine if a defendant's confession is voluntary.  *See Withrow v.*

17  *Williams*, 507 U.S. 680, 693 (1993); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *In re*

18  *Gault*, 387 U.S. 1, 45 (1967); *Gallegos v. Colorado*, 370 U.S. 49 (1962); *Haley v. Ohio*, 332 U.S.

19  596, 599-601 (1948).  However, petitioner was twenty-one years old at the time of the

20  interrogation and had a prior criminal history.  He also appeared throughout the interrogation to

21  be relatively sophisticated in his approach to Detective Winton's interrogation techniques and

22  did not appear to be unduly susceptible to police pressure.  Accordingly, petitioner's age and

23  alleged inexperience do not support his claim that his confession was involuntary.

24      For the reasons described above, petitioner's interrogation was not conducted in a

25  coercive atmosphere and did not result in an involuntary confession.  Accordingly, petitioner is

26  not entitled to relief on this claim.

36

1                    **2.  Ineffective Assistance of Counsel**

2          Petitioner's third claim is that his trial counsel rendered ineffective assistance when he

3  failed to raise "all potentially meritorious grounds" in his motion to suppress petitioner's

4  confession.  Pet. at 3.  In the motion to suppress filed in the trial court, counsel argued that

5  petitioner's confession was obtained in violation of *Miranda* because it was elicited after

6  petitioner had invoked his right to counsel and to remain silent and was coerced by threats to, or

7  manipulation of, LeTourneau.  CT at 252-68.  Petitioner argues that counsel should have raised

8  the following additional arguments: (1) Detective Winton's failure to terminate the interrogation

9  based upon petitioner's invocation of his right to silence rendered the subsequent second

10 interview coercive and involuntary; (2) Detective Winton violated the "clarification rule"  after

11 petitioner invoked his right to counsel; (3) Detective Winton engaged in "relentless

12 interrogation;" (4) Detective Winton falsely indicated that petitioner would help himself and

13 receive a lesser punishment if he confessed to his role in the homicide; (5) the interrogation was

14 "tainted by deception and subterfuge" because Detective Winton falsely told petitioner that

15 Reynoso and Avila had implicated him in the murder and that there were sufficient grounds to

16 arrest him; and (6) petitioner's relative youth and inexperience "should be considered in

17 determining whether [the] confession was voluntary."  Pet. at 4.  Petitioner raised this claim of

18 ineffective assistance of trial counsel for the first time in a petition for writ of habeas corpus filed

19 in the California Supreme Court.  Answer, Ex. K.  The Supreme Court summarily denied the

20 petition.  Answer, Ex. L.  The Supreme Court's opinion constitutes a decision on the merits of

21 this claim.  *See Hunter v. Aispuro*, 982 F.2d 344, 346-8 (9th Cir. 1992).[19]

22  _____

23      [19]  As petitioner points out, the California Court of Appeal concluded that petitioner had
    waived these claims for purposes of appeal because his trial counsel did not raise them in the
24  trial court.  Opinion at 24-25, 34-35.  However, the appellate court also addressed all of these
    claims on the merits, thereby providing a rationale for this court to consider when determining
25  whether its decision was "contrary to or an unreasonable application of federal law," pursuant to
    the AEDPA.  Because the California Supreme Court did not invoke any state procedural bar in
26  its opinion, the state appellate court's finding of waiver has no bearing on this court's

1    An attorney's failure to make a meritless objection or motion does not constitute

2  ineffective assistance of counsel.  *Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir.2000) (citing

3  *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir.1985)).  *See also Rupe*, 93 F.3d at 1445 ("the

4  failure to take a futile action can never be deficient performance").  To show prejudice under

5  *Strickland* from failure to file a motion, a defendant must show that: (1) had his counsel filed the

6  motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the

7  motion been granted, it is reasonable that there would have been an outcome more favorable to

8  him.  *Kimmelman v. Morrison*, 477 U.S. 365, 373-75 (1986).  For the reasons explained above,

9  petitioner has failed to make this showing.  Accordingly, he is not entitled to habeas relief on his

10  claim that his trial counsel rendered ineffective assistance because of his failure to make

11  additional arguments in support of his motion to suppress petitioner's confession.

12    For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

13  application for a writ of habeas corpus be denied.

14    These findings and recommendations are submitted to the United States District Judge

15  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

16  after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

19  within the specified time may waive the right to appeal the District Court's order. *Turner v.*

20  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

21  DATED:   July 3, 2007.

22

23                    EDMUND F. BRENNAN

24                    UNITED STATES MAGISTRATE JUDGE

25

26  consideration of petitioner's claim.